UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | | |
|---|---|---|
| JEFFREY RENFROE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 2:17-cv-00433-JRS-MJD |
| | ) | |
| IAC GREENCASTLE, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

**Order on Defendant's Motion for Summary Judgment (ECF No. 50)**

Defendant IAC Greencastle, LLC's Motion for Summary Judgment (ECF No. 50) is fully briefed and ripe for decision. For the following reasons, the Court concludes that the motion should be **granted in part and denied in part.**

## I.   Background

Plaintiff Jeffrey Renfroe alleges claims against Defendant IAC Greencastle, LLC ("Defendant" or "IAC"), for disparate treatment and a hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. ("Title VII"). (ECF No. 26 ¶ 25.) Specifically, Renfroe alleges that IAC (1) failed to stop Renfroe's co-workers from subjecting him to racially discriminatory and harassing comments; and (2) failed to enforce its workplace dress code, thus allowing Renfroe's co-workers to wear clothing depicting the Confederate flag. Renfroe alleges that this combination of harassing comments and Confederate flag clothing throughout his 3.5-year long employment at IAC created a hostile work environment. (ECF No. 26 ¶ 19-21.) Renfroe also seeks punitive damages because IAC failed to remedy the

discriminatory comments and dress code violations despite Renfroe's repeated reports. (ECF No. 26 at 4.) The following facts are presented in a light most favorable to Renfroe, the non-moving party.

### A. IAC Employees Wear Clothing Depicting the Confederate Flag

Renfroe worked as a continuous improvement specialist for IAC's automobile parts manufacturing plant from December 2013 until July 2017. (ECF No. 51-1 at 21; ECF No. 51-1 at 4-5.) Renfroe is African-American, and alleges that beginning in 2014, he experienced a hostile work environment in which his white co-workers frequently wore clothing and accessories displaying the Confederate flag and made racially degrading comments to him. (See ECF No. 67-1; ECF No. 51-1 at 83, 279:14-18.) Paula Miller was the Human Resource ("HR") Manager at IAC until October 16, 2014. (See ECF No. 69-1 at 36.) Senior HR Generalist Kim Vickrey was in charge of the HR Department from October 17, 2014 to January 19, 2015, when Jeri King was hired. (See ECF No. 69-1 at 36-37.) Jeri King was the HR Manager from January 20, 2015 to April 22, 2015. (See ECF No. 69-1 at 38-39.) Vickrey was again in charge of the HR Department from April 23, 2015 to July 4, 2016, providing coverage until Rachel Pearson was hired. (See ECF No. 69-1 at 37-39.) Rachel Pearson was the HR Manager at IAC from July 5, 2016 until Renfroe's employment ended on July 14, 2017. (See ECF No. 69-1 at 39.) Although Vickrey did not occupy the HR Manager role throughout Renfroe's entire period of employment, Renfroe testifies that Vickrey was a constant HR figure at IAC who temporarily filled the HR Manager role anytime

it became vacant during the course of Renfroe's employment.  (*See* ECF No. 69-1 at 36-39.)

IAC had an "anti-harassment" policy in place the whole time Renfroe was employed.  (ECF No. 69-1 at 47, 81:9-15.)  This policy directs employees to report incidents of harassment to the HR Manager or to the HR department generally.  (ECF No. 69-1 at 47, 81:16-25.)  In around February 2015 or March 2015, Renfroe lodged several complaints with Jeri King about employees wearing the Confederate flag.  (*See* ECF No. 69-3 at 5.)  Renfroe testified that during King's January 20, 2015 to April 22, 2015 term as HR Manager, he could "walk through the plant and find somebody wearing a Confederate flag on almost a daily basis."  (ECF No. 51-1 at 83.)  Renfroe says that when his complaints to King were futile, he started taking pictures of these employees.  (*See* ECF No. 69-3 at 5-6, 8, 11.)  Renfroe took ten photos of coworkers wearing clothing depicting the Confederate flag, such photos being taken in September 2015, October 2015, December 2015, February 2016, March 2016, and August 2016.  These photos show several white employees wearing Confederate flag shirts, hats, and bandanas.  (*See* ECF No. 67-1.)  In addition to the Confederate flag, some of these clothes displayed the following messages: (1) "[t]he flag may fade, but the glory never will" (ECF No. 67-1 at 25), and (2) "[c]areful with that flag son. Obamacare doesn't cover an a** whippin (sic)."  (ECF No. 67-1 at 27.)  In September 2015, Renfroe also photographed an employee's vehicle in the IAC parking lot that displayed a Confederate flag license plate.  (ECF No. 67-1 at 2-3.)

On November 28, 2016, Renfroe emailed Pearson a photograph of a co-worker wearing a Confederate flag shirt.  (ECF No. 51-2 at 58.)  Pearson testified that aside from this photo, she had not seen employees wearing Confederate flag clothing, even though she was "on the floor on a regular basis" policing for employees' general compliance with IAC's dress code and other policies.  (ECF No. 51-3 at 14, 44:6-10; ECF No. 51-3 at 14, 44:12-22.)  Pearson investigated Renfroe's complaint and disciplined the culpable employee by removing the employee from her job post, requiring her to change into a work-appropriate shirt, and assessing the employee a written discipline referral.  (ECF No. 51-4 at 3-4.)  In contrast to Pearson's testimony that she had never seen employees wearing Confederate flag attire in her "regular" rounds of the plant floor, a former plant supervisor, Larry Ashley, testified that he "routinely" saw such inappropriate dress on the plant floor during the last year of his employment at IAC, which ended in March 2017.  (ECF No. 67-4 at 2.)

Following this November 2016 incident, IAC implemented respectful workplace training and required all employees to attend.  (ECF No. 51-3 at 12.)  Pearson also asked Renfroe to report any future instances of inappropriate clothing so that Pearson could take remedial action.  (ECF No. 51-3 at 14, 44:8-12.)  Pearson then followed-up with the HR department, Renfroe's supervisors, and other plant staff to learn whether anyone else had seen employees wearing clothes displaying the Confederate flag at work, and no one had.  (ECF No. 51-3 at 14.)  In addition, the HR department emailed IAC's dress code to employees in May 2015, June 2016, and June 2017 to remind employees of appropriate workplace attire.  (ECF No. 51-4 at 5-7.)

The IAC dress code prohibited employees from wearing "clothing with offensive words, terms, logos, pictures, cartoons or slogans" and advised employees that "[o]ther inappropriate wear [would] be addressed on a case-by-case basis." (ECF No. 67-3 at 1-3).

### B. Renfroe is Subjected to Racially Insensitive Comments by Co-Workers

In addition to Renfroe's co-workers' wearing Confederate flag clothing, they allegedly subjected Renfroe to racially discriminatory comments on a handful of occasions. During a December 2014 safety team meeting, one of Renfroe's white co-workers used a racial slur in front of Renfroe, stating that the safety team could "[n****r]-rig" a repair, describing a poor method of fixing a maintenance issue. (ECF No. 68 at 3; ECF No. 51-1 at 27.) Renfroe left this meeting and went to IAC's HR Department to report this incident, but no one from HR was available. (ECF No. 51-1 at 29.) Later that day, the offending employee jokingly asked Renfroe if he had "hear[d] what [the offending employee] said" earlier. (ECF No. 51-1 at 28, 118:16-19.) Renfroe later reported this incident to Vickrey, who instructed the offending employee to apologize to Renfroe. (ECF No. 51-1 at 31.)

In September 2015, an IAC employee referred to Renfroe as the "rich monkey who drives the Mercedes." (ECF No. 69-2 at 164; ECF No. 67-1 at 1.) Renfroe did not report this incident to IAC's HR department because Renfroe did not like the way IAC handled his discrimination complaints in the past. (ECF No. 51-1 at 35, 164:12-25.) In around November or December 2015, another of Renfroe's white co-workers told Renfroe that "black lives don't matter . . . in Greencastle." (ECF No. 51-1 at 39.)

Renfroe attempted to verbally report this comment to King, but she acted like she was in too much of a hurry to listen to this complaint. (ECF No. 51-1 at 39.) In addition, another of Renfroe's co-workers told Renfroe that "[w]e're about to have our first black president . . . . [President Barack Obama] may not make it because he might get hung . . ."[1] (ECF No. 51-1 at 36.) That same employee also asked Renfroe if black people are required to complete more engineering schooling than white people, because "you guys are . . . dumber than every other race." (ECF No. 51-1 at 36.)

In December 2016, some of Renfroe's co-workers took to a union-employee Facebook group to discuss Renfroe's reports of racial discrimination; namely, that his co-workers had been wearing Confederate flag clothing. (ECF No. 67-1 at 29-32.) One employee in this group posted a warning to the other members of the group, advising "anyone who speaks with Jeff Renfroe . . . to be cautious. He has filed multiple complaints against [IAC employees] in the past few months." (ECF No. 51-2 at 60-63.) Another union-employee posted a comment in the Facebook group that "[Renfroe is] causing trouble[,] but his job won't be downsized [be]cause he's gonna play the race card[.] . . . [H]e's in for a fight because he picked on the wrong one this time." (ECF No. 67-1 at 31.) Renfroe was not a member of this Facebook group and only learned of the messages because several IAC employees showed him the posts. (ECF No. 51-1 at 72.) Renfroe took screenshots of these Facebook posts and showed them to Pearson. (ECF No. 51-3 at 26-27.) Pearson then shared images of these posts with

---

[1] President Obama was elected in 2008 and this comment was not made until 2015. However, Renfroe testified that his co-worker made this comment despite the co-worker's apparent misunderstanding of time surrounding President Obama's election. (See ECF No. 51-1 at 36, 181:2-14.)

IAC's plant manager and HR director. The next day, Pearson held a meeting with union committee members to discuss the inappropriate nature of the Facebook posts. (ECF No. 51-3 at 30, 68:3-15.)

Sometime prior to April 22, 2016, another of Renfroe's white co-workers stated that it takes black people longer to complete educational degrees than white people because "black people are too busy killing each other." (ECF No. 51-1 at 44.) On November 21, 2016, as Renfroe was on his way to an IAC pot luck lunch, he encountered several IAC employees who were bringing food to the luncheon. Renfroe asked these employees what food they were carrying, and one white employee laughed and responded, "this ain't no chicken, greens and watermelon." (ECF No. 51-1 at 68.) Renfroe sent an email report of this incident to Pearson. (ECF No. 51-2 at 51.) Pearson was out of the office at the time of Renfroe's email, but Kim Vickrey started the initial investigation of Renfroe's complaint while Pearson was away. (ECF No. 51-3 at 11.) Upon Pearson's return, she continued Vickrey's investigation and disciplined the employee who made the comment, assessing the employee a two-day suspension and issuing the employee a formal referral to the Employee Assistance program for "sensitivity and harassment law" training. (ECF No. 51-3 at 12; ECF No. 51-4 at 1-3.)

Renfroe filed an EEOC Charge of Discrimination on February 6, 2017, alleging against IAC race discrimination, harassment, and a hostile work environment due to IAC's failure to stop the harassing comments and acts of Renfroe's co-workers. (ECF No. 51-2.) Renfroe testified that as a result of his co-workers' harassment, he

"experienced severe emotional distress and stress," "[o]ften times . . . dreaded going to work because [he] expected the worst every workday," and was "paranoid of when the next harassing incident would occur." (ECF No. 67-5 at 1.) Renfroe also alleged in his EEOC Charge that IAC subjected him to disparate treatment. (ECF No. 51-2.) In July 2017, Renfroe resigned from IAC. (ECF No. 51-1 at 4-5.)

## II.    Legal Standard

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). Rule 56 makes clear that whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the Court considering the movant's fact undisputed, and potentially showing the movant is entitled to the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.,* *561 F.3d 709, 713 (7th Cir. 2009).* On summary judgment, a party must show the

Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512 F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the factfinder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## III.    Discussion

### A. Hostile Work Environment

#### i. The Continuing Violation Theory Applies

Before an employee may file a lawsuit under Title VII, he must first file a charge with the EEOC. The EEOC charge must be filed within 300 days of the alleged unlawful employment practice. 42 U.S.C. §2000e-5(e)(1). There is no dispute about the timeliness of Renfroe's Title VII claim. Rather, IAC disputes Renfroe's ability to rely on certain conduct alleged to have created the hostile work environment and argues that this conduct is time-barred. Specifically, IAC argues that because Renfroe's administrative charge was filed on February 6, 2017, the statutory 300-day

period for his claims only reaches back to April 12, 2016, and any alleged harassing conduct that occurred prior to April 12, 2016 is time-barred. (ECF No. 51-2 at 66.)

However, the "continuing violation" theory permits a court to consider otherwise time-barred acts of discrimination as part of an ongoing pattern, provided *at least one* of the acts occurred within the relevant limitations period. *See Nat'l R.R. Passenger Corp. v. Morgan,* 536 U.S. 101, 120 (2002) (finding that the incidents constituting a hostile work environment were part of one unlawful employment practice where both timely and otherwise time-barred conduct constituted the same type of employment actions, occurred relatively frequently, and were perpetrated by the same individuals). Under the continuing violation theory, the relevant statute of limitations will not bar the Court from considering otherwise time-barred conduct, "so long as it formed a single unlawful employment practice that reached into the statutory period." *Milligan-Grimstad v. Stanley,* 877 F.3d 705, 712 (7th Cir. 2017) (finding that facts such as "the harassers' identities, whether they acted in concert or isolation, and whether they harassed in distinct or similar fashions" are irrelevant to whether the allegations form a single unlawful practice); *see also Pruitt v. City of Chicago,* 472 F.3d 925, 928 (7th Cir. 2006).

IAC puts forth two arguments to dissuade the Court from applying the continuing violation theory. First, IAC argues that the alleged "time-barred" incidents Renfroe complains of are unrelated to one another as they are so "discrete in circumstance and time" that they fail to "reinforce each other into [the] single chain of conduct necessary to defeat the statute of limitations." (ECF No. 51 at 13.) However, viewing

10

the record in the light most favorable to Renfroe, the Court finds that the alleged "time-barred" events Renfroe complains of are sufficiently related to the timely acts, thus allowing the Court at this juncture to string these events together to form a "single unlawful employment practice" under the continuing violation theory. Here, Renfroe submits photographic evidence of at least ten instances of employees wearing Confederate flag attire from September 2015 through August 2016. (ECF No. 67-1 at 4-28.) Renfroe also alleges at least three other incidents of harassment that occurred during the statutory period, including the November 21, 2016 "chicken, greens, and watermelon" comment, the December 1, 2016 Facebook incident, and the November 2016 incident in which Renfroe reported to HR Manager Pearson that another co-worker wore a Confederate flag shirt. (ECF No. 51-2 at 51; ECF No. 51-3 at 26-30; ECF No. 51-1 at 40; 187:14-15.)

Drawing all reasonable inferences in a light favorable to Renfroe, the Court finds that the alleged harassing events that occurred both within and outside of the statutory period are related. Renfroe's report in November 2016 that a co-worker wore a Confederate flag shirt could relate to the eleven other photographed Confederate flag sightings. Similarly, the "chicken, greens, and watermelon" comment and Facebook incident during the statutory period also relate to the other derogatory comments Renfroe's co-workers made prior to April 12, 2016 about the African American race generally, and about Renfroe directly, calling Renfroe a "monkey" and telling Renfroe his team could ["n****r]-rig" a repair. These events are all racial in nature, occurred throughout Renfroe's employment, and were perpetrated each time by

Renfroe's co-workers. Thus, Renfroe has put forth sufficient evidence that IAC employees (1) wore Confederate flag attire *at least in part* within the statutory period in November 2016, as well as on at least eleven other occasions within and outside the statutory period; and (2) made derogatory comments about Renfroe's race *at least in part* within the statutory period in November 2016 and December 2016, and on at least six other occasions outside the statutory period including the "n****r-rig" comment in December 2014, the "monkey" comment in September 2015, the lynching comment in December 2015, the "no black lives matter" comment in February 2016, and the two incidents sometime prior to April 22, 2016 where Renfroe's co-workers asked him if black people had to complete more schooling than white people. While a close call, there is sufficient evidence at this juncture to find that a "single unlawful employment practice" existed at IAC, thus allowing the Court to consider events before and after April 12, 2016 in evaluating Renfroe's hostile work environment claim. *Morgan*, 536 U.S. at 118 ("otherwise time-barred acts" can be considered part of a single hostile work environment where these acts are "related to the timely acts"); *see also Williams v. City of Chicago*, 325 F. Supp. 2d 867, 875 (N.D. Ill. July 13, 2004) (conduct was actionable under the continuing violation theory where time-barred acts were sufficiently related to the timely acts).

### ii. The "Intervening Action" Theory is Inapplicable

Even where the continuing violation theory applies to group conduct into one hostile work environment, "certain intervening action by the employer" can break the chain of relation between timely and alleged time-barred acts, barring the Court from

considering acts that occurred prior to the statutory period. *See Morgan*, 536 U.S. at 118; *see also Williams*, 325 F. Supp. 2d at 874 (noting "an intervening action by an employer can break [the] relation between time-barred and timely acts for purposes of continuing violation doctrine under Title VII"). Here, IAC argues that "Pearson's assumption of the Human Resource Manager position in July 2016, and her handling of Renfroe's complaints, constitute intervening employer action[s] that severed any causal connection" between alleged timely conduct and any alleged harassing conduct prior to April 12, 2016. (ECF No. 83 at 4.)

However, "routine personnel actions" such as retirement, promotion, or, as in the present case, hiring of new HR Managers, are not the type of "intervening action[s] by the employer" that would sever the earlier incidents from the more recent incidents constituting a hostile environment claim. *See Vickers v. Powell*, 493 F.3d 186, 199 (D.C. Cir. 2007). IAC fails to argue that the changes in HR Management were undertaken to remove Renfroe from a hostile environment or to remedy certain misconduct; thus, the Court finds Pearson's assumption of the HR Management position insufficient to constitute an "intervening action," though Pearson's actions in remedying Renfroe's complaints can be construed as evidence of an "employer response" to Renfroe's reports of misconduct. *See Cerros v. Steel Techs., Inc.,* 398 F. 3d 944, 953–54 (7th Cir. 2005).

Moreover, the caselaw IAC relies on to argue that it took appropriate "intervening action" is not analogous to the present case and fails to persuade the Court that the changes in HR management at IAC were sufficient to break the causal chain

or were reasonably calculated to prevent future harassment. *See Fairley v. Potter, No. C-01-1363 VRM, 2003 WL 403361, \*10 (N.D. Cal. Feb. 13, 2003)* (entirely new supervisors and evidence that the employer properly responded to complaints constitutes intervening action); *Stewart v. Miss. Transp. Comm'n., 586 F. 3d 321, 328 (5th Cir. 2009)* (an investigation and reassignment to a new supervisor where the supervisor was the alleged harasser constituted intervening action by the employer sufficient to sever acts that preceded it from those subsequent to it for the purposes of Title VII liability). IAC neglects an important distinction between the foregoing cases and the present case—the plaintiffs in IAC's cited cases were transferred to different work units or to another supervisor's control as a response to the plaintiffs' complaints.

As mentioned above, the present case includes changes in HR Management that were unrelated to any effort by IAC to remove Renfroe from his alleged hostile working conditions. *See Powell, 493 F.3d at 199.* Although the Court can imagine circumstances in which a change in managers might affect a hostile work environment claim, there is nothing in the record to show that Pearson's assumption of the HR Manager role was in any way intended to address the environment created by the alleged harassment by Renfroe's co-workers. Thus, IAC's argument that Pearson took prompt "intervening action" is misplaced and would be better applied as support for its argument under the "employer liability" prong of the hostile work environment test rather than as an argument against a finding of a continuing violation. Accordingly, for the purposes of summary judgment, the Court considers all the harassment

Renfroe alleges prior to April 12, 2016 up until his resignation as contributing to the same alleged hostile work environment.

### iii. Renfroe's Hostile Work Environment Claim

"Title VII prohibits the creation of a hostile work environment." *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013). A plaintiff may establish a violation under Title VII by proving that he was subjected to a hostile work environment. *See Hrobowski v. Worthington Steel Co.*, 358 F.3d 473, 476 (7th Cir. 2004). To survive a summary judgment motion, a plaintiff must show (1) his work environment was both objectively and subjectively offensive; (2) the harassment complained of was based on his race; (3) the conduct was either severe or pervasive; and (4) there is a basis for employer liability. *See Alamo v. Bliss,* 864 F.3d 541, 549 (7th Cir. 2017).

The first question is whether the comments of Renfroe's co-workers and the Confederate flag attire these employees wore created an objectively hostile work environment. An objectively hostile environment is one that a reasonable person would find hostile or abusive. *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). In determining whether a plaintiff meets this standard, courts consider all the circumstances, including the severity of the allegedly discriminatory conduct, its frequency, whether it is physically threatening or a mere offensive utterance, and whether it unreasonably interferes with the employee's work performance. *Id.* at 23. However, "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not rise to the level of conduct that alters the terms and conditions of employment." *Adusumilli v. City of Chicago*, 164 F.3d 353, 361-62 (7th Cir. 1998)).

Renfroe has adduced evidence showing that several of his white co-workers uttered "discriminatory" and "racially insensitive comments," and wore clothing bearing the Confederate flag during his employment. (ECF No. 26 ¶ 16; ECF No. 51-2 at 65-66; ECF No. 67-1.) Specifically, Renfroe indicated that his co-workers (1) wore Confederate flag clothing on an almost daily basis from January 20, 2015 to April 22, 2015; (2) wore Confederate flag clothing at least ten other times, which he photographed; (3) uttered abusive language when one employee referred to Renfroe as the "rich monkey who drives the Mercedes;" (4) derided his race by the menacing allusion to the lynching of President Obama; (5) mocked Renfroe's race by telling him that an IAC luncheon menu was not "chicken, greens, and watermelon;" (6) asked Renfroe if black engineers took longer to obtain engineering degrees than whites because blacks are dumber than every other race; and (7) stated to Renfroe that black people took longer to complete educational degrees than white people because blacks are too busy killing each other. (ECF No. 51-1 at 36, 44.)

Renfroe must further establish that the racially offensive comments and clothing created a work environment that a reasonable person would find offensive or hostile. *See Ellis v. CCA of Tenn. LLC*, 650 F. 3d 640, 647 (7th Cir. 2011). With respect to the racial slur uttered by the employee who used the word "n****r-rig," the Seventh Circuit recognizes that "[g]iven American history . . . the word 'n****r' can have a highly disturbing impact on the listener." *Hrobowski*, 358 F.3d at 477; *see also Ellis*, 650 F. 3d at 648 ("[t]o suggest that a human being's physical appearance is essentially a caricature of a jungle beast . . . is degrading and humiliating in the extreme")

(quoting *Green v. Franklin Nat'l Bank of Minneapolis*, 459 F. 3d 903, 911 (8th Cir. 2006). The Seventh Circuit further concluded that "a plaintiff's repeated subjection to hearing [the word n****r] could lead a reasonable factfinder to conclude that a working environment was objectively hostile." *Id.* Renfroe's co-worker's use of this racial slur alone, combined with (1) the other alleged abusive comments uttered by his co-workers about lynching President Obama and calling Renfroe a "monkey," and (2) the Confederate flag clothing Renfroe's co-workers frequently—and at times even on a daily basis—wore (ECF No. 67-1 at 2-28), could lead a reasonable jury to conclude that Renfroe was exposed to an objectively hostile work environment.

To meet the subjective requirement of the hostile work environment test, Renfroe must only establish that he perceived the environment to be hostile or abusive. *See Haugerud v. Amery Sch. Dist.*, 259 F.3d 678, 695 (7th Cir. 2001). Here, Renfroe testified that he was subjected to racially offensive comments which he perceived to be "degrading" and "humiliating." (ECF No. 67-5.) He also complained to IAC's management about this hostile treatment and took photographs of the Confederate flag clothing worn at the plant to document the prevalence of the misconduct. (ECF No. 67-1.) In addition, Renfroe alleged in his EEOC charge that the hostile treatment caused him to suffer from "severe emotional distress," "stress," and "paranoi[a] of when the next harassing incident would occur," and made him "dread[] going to work because [he] expected the worst every workday." (ECF No. 67-5.) And as noted, the Seventh Circuit recognizes that "[g]iven American history . . . the word 'n****r' can have a highly disturbing impact on the listener." *Hrobowski*, 358 F.3d at 477.

Therefore, because Renfroe made several complaints to IAC management, documented his co-workers' offensive clothing, and documented that he felt "degrad[ed] and humiliate[ed]" by his co-workers' conduct and comments, a reasonable jury could conclude that Renfroe subjectively perceived his work environment to be hostile. Accordingly, Renfroe has presented sufficient evidence at this stage to establish the first prong of his hostile work environment claim; namely, that the work environment was both objectively and subjectively hostile.

Next, there is no dispute as to whether the alleged harassment was based on Renfroe's race. Here, IAC employees allegedly uttered the unambiguous racial epithet "n****r" to Renfroe and compared Renfroe to a "monkey." Courts around the country have agreed that Confederate flags and the racial slurs "monkey" and "n****r" are often used to offend black people. *See Hrobowski*, 358 F.3d at 477 ("Given American history, [the Seventh Circuit] recognize[s] that the word 'n****r' can have a highly disturbing impact on the listener"); *Ayissi-Etoh v. Fannie Mae*, 712 F. 3d 572, 580 (D.C. Cir. 2013) (noting that the racial epithet "n****r" is "probably the most offensive word in the English language" which "instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African-Americans"); *see generally* Alex Haley, Roots (1976); Harper Lee, To Kill a Mockingbird (1960). Accordingly, the second prong of Renfroe's hostile work environment claim is satisfied.

Under the third prong, Renfroe must establish that the offensive racial epithets, other offensive language used by IAC's employees, and the offensive clothing

Renfroe's co-workers wore was either severe or pervasive such that the conduct altered the conditions of Renfroe's employment. *Nasserizafar v. Ind. Dep't of Transp.,* 546 F. App'x 572, 575 (7th Cir. 2013) (citing *Scruggs v. Garst Seed Co.,* 587 F.3d 832, 841 (7th Cir. 2009); *Ezell v. Potter,* 400 F.3d 1041, 1047–48 (7th Cir. 2005); *Racicot v. Wal–Mart Stores, Inc.,* 414 F.3d 675, 677–78 (7th Cir. 2005)). Courts consider the totality of the circumstances when assessing the severity or pervasiveness of the conduct. *See Rodgers v. W.-S. Life Ins. Co.,* 12 F.3d 668, 674. Specifically, courts consider the frequency of the discriminatory conduct, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance. *See Russell v. Bd. of Trs. of Univ. of Ill. at Chi.*, 243 F.3d 336, 343 (7th Cir. 2001). The Seventh Circuit has also held that pervasiveness requires a "concentrated or incessant barrage" of conduct. *Whittaker v. N. Ill. Univ.,* 424 F.3d 640, 646 (7th Cir. 2005).

Renfroe argues that the Confederate flag attire worn by his IAC co-workers and his co-workers' derogatory comments were "pervasive." (ECF No. 68 at 20.) So pervasive, that it made him dread coming to work, made him paranoid, and made him not trust white people. (ECF 68 at 21.) So pervasive, that even after numerous dress code reminders and corrective actions by IAC's HR Managers, his co-workers continued to wear Confederate flag clothing, thus subjecting Renfroe to an "incessant barrage" of Confederate flag symbols worn by his co-workers. (ECF No. 68 at 20.) Renfroe also testifies that his co-workers' uttered the words "n****r"-rig and "monkey," and directed other racially offensive comments to him, including comments that

"black lives don't matter," blacks are "dumber" than every other race, America's first black President may get "hung," it takes blacks longer to earn engineering degrees than whites because they are too busy killing each other, and there would be no "chicken, greens, and watermelon" served at the IAC lunch. Renfroe alleges this conduct occurred from December 2014 until the end of his employment in July 2017. (ECF No. 51-1 at 28, 36, 44, 51, 66; ECF No. 67-5.)

IAC contends that, offensive though it may be, the alleged conduct was insufficiently "severe or pervasive" to meet the third prong of the test. (ECF No. 51 at 14-19.) IAC argues that the present case is like *Ellis*, in which the court concluded that two incidents of employees wearing the Confederate flag, and an employer's doctor referring to a coworker as "black a** coal" or "black as coal" were "insufficiently severe" to support a hostile work environment claim. *Ellis*, 650 F.3d at 648-49. However, the facts presented in Renfroe's case are distinguishable from those in *Ellis*. First, the plaintiffs in *Ellis* were subjected to only two incidents of co-workers wearing Confederate flag clothing. *Id.* at 645. Renfroe presents evidence that beginning in December 2014 he was subjected to racially offensive comments and saw co-workers wearing the Confederate flag frequently, and at times "almost daily." (ECF No. 51-1 at 83; ECF No. 67-4; ECF No. 67-5.) Former plant supervisor Larry Ashley also testifies that Confederate flag clothing could be seen on the IAC plant floor "routinely." In addition, Renfroe presents ten photographs of his co-workers wearing Confederate flag clothing and one photograph of a Confederate flag license plate on a vehicle in IAC's parking lot. (ECF No. 67-1 at 2-28.)

Moreover, the *Ellis* court found that "the record evidence [did] not support [the] plaintiffs' characterization" of the alleged discrimination. *Id*. For example, the *Ellis* plaintiffs alleged that employees used the word "monkey" over a workplace intercom system on two occasions, but failed to present evidence that the comments were indeed used in a racial context or that the comments were even directed at the plaintiffs. *Id*. In contrast, Renfroe has presented evidence that the racially offensive comments made by his co-workers were stated directly to him and that these comments were indeed used in a racially offensive context. (ECF No. 51-1 at 28, 35-36, 68.) Thus, the alleged routine nature of the Confederate flag clothing worn by Renfroe's co-workers, combined with the racially offensive comments spoken directly to Renfroe over the course of his 3.5-year term of employment, is distinguishable from *Ellis* and is similar to *Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994). In *Dey*, the Seventh Circuit concluded that offensive conduct an employee was subjected to on a "daily" basis for over two years, including "comments, gestures, and innuendo," created a genuine issue of fact as to the existence of a hostile and abusive working environment. 28 F.3d at 1456–57. Renfroe has created a similar genuine issue of fact here.

"[I]t is a combination of severity and frequency that reaches the level of actionable harassment." *E.E.O.C. v. Caterpillar Inc.*, 503 F. Supp. 2d 995, 1015–16 (N.D. Ill. 2007) (citing *Patton v. Keystone RV Co.*, 455 F.3d at 812, 816–17 (7th Cir. 2006)). Renfroe's evidence presents such a combination of offensive and severe racial comments and frequently worn Confederate flag clothing, such that a reasonable

factfinder could conclude that the alleged harassment was "pervasive." *Cf. Thomas v. Fairfield Mfg. Co., Inc.*, No. 4:07-CV-56, 2009 WL 1043959, at *11 (N.D. Ind. Apr. 17, 2009) (isolated racial comments made months apart were not sufficiently pervasive); *Washington v. Am. Drug Stores, Inc.*, 119 F. App'x. 3, 6 (7th Cir. 2004) (a handful of unrelated instances over a 13-month period were not sufficiently pervasive to establish a claim of actionable harassment).

IAC agrees that "the Confederate flag is offensive and violates its policies," but argues the alleged conduct, especially to the extent it includes *unreported conduct* during the relevant period, was not "sufficiently severe or pervasive to rise to the level of actionable harassment." (ECF No. 83 at 12.) Regardless of whether Renfroe reported to HR *every time* a co-worker wore Confederate flag clothing or directed a racially offensive comment toward him, what reports Renfroe did make involved his co-workers' use of some of the most extreme terms of racial degradation, "n****r," "monkey," and a reference to lynching the first black President. Renfroe also took ten photographs of IAC co-workers in Confederate flag garb and presented testimony that his co-workers wore Confederate flag garb daily. Accordingly, the Court finds that Renfroe has set forth sufficient evidence from which a jury could find that the racial harassment he experienced at IAC was pervasive.

Yet, IAC argues that Renfroe fails to show his co-workers' alleged harassment significantly altered the terms of his employment, attacking Renfroe's affidavit as "legally deficient." (ECF No. 83 at 9.) Renfroe testifies in his Affidavit that he felt emotional distress, stress, humiliation and paranoia as a result of his co-workers'

alleged harassment. (ECF No. 67-5.) IAC argues that this affidavit is "unnotarized" and that it puts forth nothing more than conclusory statements, and as such, cannot be considered as evidence in opposition to its summary judgment motion. (ECF No. 83 at 8-9.) However, both affidavits and declarations are considered proper evidence to support or oppose a motion for summary judgment. *See* Fed. R. Civ. P. 56(c)(4) advisory committee's note to 2010 amendment (noting that formal affidavits are "no longer required," and declarations under penalty of perjury pursuant to 28 U.S.C. § 1746 are sufficient). Thus, the Court accepts Renfroe's declaration, made under penalty of perjury, as competent evidence under Rule 56(c).

While the Court acknowledges that "not all workplace conduct that may be described as 'harassment' affects a 'term, condition or privilege' of employment within the meaning of Title VII," Renfroe also need not show that he suffered a "nervous breakdown" to prove his employment conditions were altered by his co-workers' harassment. *See Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22, (1993); *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). "To qualify as a hostile work environment, the conduct at issue must simply be severe or pervasive enough to cause psychological injury." *Ellis*, 650 F. 3d at 647. Therefore, all Renfroe must do at this juncture is present evidence from which a reasonable jury could find that the alleged harassment of Renfroe by his co-workers was so pervasive that it could cause Renfroe's alleged emotional stress, humiliation, and paranoia, thus altering the conditions of his employment. Again, Renfroe's testimony that his co-workers' harassment caused him psychological injury including stress, emotional distress, humiliation, and paranoia

could lead a reasonable factfinder could find the alleged harassment was sufficiently pervasive to alter Renfroe's employment conditions.

Lastly, Renfroe must establish that there is a basis for assessing employer liability on IAC for the actions of its employees. Generally, the standard for employer liability with respect to a hostile work environment claim turns on whether the harasser is the victim's supervisor or merely a co-worker. *Hrobowski*, 358 F.3d at 477 (citing *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1032 (7th Cir. 1998)). In particular, "[a]n employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Parkins*, 163 F.3d at 1032 However, in the absence of supervisory authority, an employer will be liable for a co-worker's harassment only when the employer has been negligent either in discovering or remedying the racial harassment. *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1032 (7th Cir. 1998). In the present case, Renfroe alleges that his co-workers harassed him, so he must present evidence that IAC was negligent in discovering or responding to the racial harassment of its employees.

Notice or knowledge of harassment is a prerequisite for establishing employer liability. *Parkins*, 163 F. 3d at 1035. In determining whether an employer received notice, courts will consider whether a complainant informed a department head or someone that the complainant reasonably believed was authorized to receive and respond to a complaint of harassment. *Id.* However, an employer could be charged with constructive notice where the harassment was sufficiently obvious. *See*

*Hrobowski,* 358 F.3d at 478 (citing *Mason v. S. Ill. Univ.,* 233 F.3d 1036, 1046 (7th Cir. 2000)). Drawing all reasonable inferences in a light favorable to Renfroe, including his statement and Larry Ashley's statement that Confederate flag clothing was worn on a daily or routine basis, could lead a jury to find that the Confederate flag clothing worn by IAC employees was "sufficiently obvious" on the plant floor, thus giving IAC constructive notice of the harassment. (ECF No. 67-4; ECF No. 67-5.)

An employer having constructive notice of alleged harassment may avoid liability if the employer's response to allegations of harassment is "reasonably calculated to prevent further harassment under the particular facts and circumstances of the case at the time the allegations are made." *Cerros,* 398 F.3d at 953-54 (quoting *McKenzie v. Ill. Dep't of Transp.,* 92 F.3d 473, 480 (7th Cir. 1996)) (emphasis removed) (internal quotation marks omitted). In other words, the employer must take "prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring." 398 F.3d at 954 (quoting *Williams v. Waste Mgmt. of Ill.,* 361 F.3d 1021, 1029 (7th Cir. 2004)); *see Longstreet v. Ill. Dep't of Corr.,* 276 F. 3d 379, 382 (7th Cir. 2002) ("deterrence is an objective in imposing liability on employers for the creation of a hostile environment by a plaintiff's co-workers").

Although the evidence in this case shows that Pearson remedied certain alleged incidents of harassment Renfroe reported to her during her tenure as HR Manager, a question of fact exists with respect to whether Pearson or the preceding HR Managers, Kim Vickrey, Jeri King, and Paula Miller took prompt and appropriate corrective action reasonably likely to "prevent" further harassment from recurring. Renfroe

testifies that he complained to Jeri King about his co-workers' wearing Confederate flag clothing and King failed to act. (ECF No. 51-1 at 175, 177-178.) Renfroe also testifies that he resorted to taking photographs of co-workers wearing the Confederate flag after his "numerous" complaints about this issue to King were futile. (*See* ECF No. 69-3 at 5-6, 8, 11.) The evidence also shows that King, Vickrey, and Pearson sent out dress code reminders in response to Renfroe's complaints of Confederate flag attire on the plant floor. Renfroe testified that he continued to see his co-workers wearing Confederate flag clothing despite these dress code reminders. This evidence could lead a reasonable jury to infer that IAC's remedial efforts were insufficient to prevent employees from wearing the racially offensive clothing. (*See* ECF No. 51-4 at 5-6; ECF No. 67-1 at 28; ECF No. 69-2 at 54.) Accordingly, Renfroe has shown a question of fact exists as to the sufficiency of IAC's response to Renfroe's complaints of harassment, at least with respect to his Confederate flag clothing complaints, because Renfroe has presented evidence from which a reasonable jury could find IAC was negligent in discovering or preventing Renfroe's co-workers' wearing of Confederate flag clothing. (*See* ECF No. 51-3 at 14, 44:6-10; ECF No. 51-3 at 14, 44:12-22.)

Renfroe's Hostile Work Environment claim will survive summary judgment.

### B. Disparate Treatment Claim

Under Title VII, it is unlawful for an employer to "discriminate against any individual . . . because of such individual's race . . . ." 42 U.S.C. § 2000e–2(a)(1); *see also Lauderdale v. Ill. Dep't of Human Servs.*, 876 F.3d 904, 909 (7th Cir. 2017). Discrimination claims may survive summary judgment when a plaintiff presents

evidence that permits a reasonable factfinder to conclude that the employer took an adverse action against the employee because of the employee's race or national origin. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). A plaintiff establishes a prima facie case of discrimination under Title VII by presenting evidence that would allow a reasonable jury to find on each claim that: (1) he is a member of a protected class; (2) he was meeting the employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than a similarly situated non-protected class member. *See Farrell v. Butler Univ.*, 421 F.3d 609, 613 (7th Cir. 2005). Here, Renfroe seeks to establish discrimination (which Renfroe characterizes as "disparate treatment") by alleging that he was treated differently by his supervisors who "required him to work extra shifts and hours that white engineers were not required to work." (ECF No. 26 ¶¶ 22-23.)

Fatally, Renfroe fails to put forth any evidence that he experienced a materially adverse employment action or that he was required to work extra hours that his similarly situated white colleagues were not required to work. Renfroe alleges he was treated differently on the basis of his race when he was assigned an on-call shift over the weekend in September 2016. (ECF No. 51-1 at 56-57.) However, changes in job assignments do not constitute "materially adverse employment actions" under Title VII. *See Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (confirming a materially adverse employment action is one that significantly alters an employee's terms and condition of employment). This is especially the case here, where there is no

evidence linking this shift assignment to race, and no evidence of an adverse action when he missed this one-time shift assignment.

Renfroe appears to abandon this argument in any event. Indeed, Renfroe fails in his response to address Defendant's argument for summary judgment on this claim, amounting to an abandonment of the claim. *See Palmer v. Marion Cnty.*, 327 F.3d 588, 597 (7th Cir. 2003) ("[B]ecause Palmer failed to delineate his negligence claim in his district court brief in opposition to summary judgment . . . his negligence claim is deemed abandoned.") *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562, n.2 (7th Cir. 1996) ("Bombard abandoned his FMLA claim after failing to respond to the FMLA arguments in FWN's motion for summary judgment."). And although Renfroe may have disliked IAC's requirement for weekend work, as already noted, he fails to show how this request constitutes a materially adverse employment action that significantly altered his employment terms. For these reasons, this claim fails as a matter of law and IAC is entitled to summary judgment.

### C. Punitive Damages

Punitive damages are available only if an employer acted "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1). The mere ineffectiveness of an employer's harassment policy, without more, fails to support an award of punitive damages. *See Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 545 (1999). The uncontroverted evidence in this case shows (1) employees violated IAC's dress code by openly wearing Confederate flag clothing, (2) Renfroe was subjected to racially offensive comments during the course

of his employment, and (3) IAC failed to remedy every instance of harassment Renfroe alleges. But, Renfroe fails to adduce evidence showing that IAC's shortcomings are attributed to malice and reckless indifference. Thus, punitive damages cannot be supported, and IAC is entitled to summary judgment on Renfroe's punitive damages claim.

## IV.    Conclusion

For the foregoing reasons, IAC's Motion for Summary Judgment (ECF No. 50) is **GRANTED in part and DENIED in part**. Accordingly, Plaintiff's Disparate Treatment and Punitive Damages claims will be dismissed, and Plaintiff's Hostile Work Environment claim will proceed to trial. Plaintiff's Motion for Oral Argument (ECF No. 86) is **DENIED** as moot.

**SO ORDERED.**

Date: 5/9/2019

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Melissa Anne Ebel
EASTMAN & SMITH, Ltd.
maebel@eastmansmith.com

Thomas J. Gibney
EASTMAN & SMITH, LTD.
tjgibney@eastmansmith.com

Ronald E. Weldy
WELDY LAW
rweldy@weldylegal.com